**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WILLIAM DOVE, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.  12-4384 |
| COMMUNITY EDUCATION CENTERS | : | |
| INC., d/b/a GEORGE W. HILL | : | |
| CORRECTIONAL FACILITY, | : | |
| DELAWARE COUNTY PRISON, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                             December 2, 2013

Currently pending before the Court is the Motion for Summary Judgment by Defendant

Community Education Centers, Inc. d/b/a George W. Hill Correctional Facility, Delaware

County Prison ("CEC").  For the following reasons, the Motion is granted and judgment shall be

entered in favor of Defendant and against Plaintiff on the entirety of the Complaint.

## I.     STATEMENT OF FACTS

### A.     Plaintiff's Past Medical History

Plaintiff, William Dove, was originally diagnosed with bipolar depression during his

junior year of high school in 2001 to 2002.  (Def.'s Mot. Summ. J., Ex. A, Dep. of William Dove

("Dove Dep."), 13:10–14:13, Apr. 22, 2013.)  He had been experiencing symptoms of severe

depression, such as locking himself in his room, putting shades over his windows, and not eating.

(Id. at 14:19–15:2.)  A psychiatrist met with him on one occasion and diagnosed him with

depression.  (Id. at 15:3–25.)  After that, Plaintiff treated with his family doctor, Kenneth Morris,

but he did not pursue any further treatment with any other specialist.  (Id. at 16:11–17:4.)  Dr. Morris prescribed him fifteen milligrams of Zoloft three times a day, which he took continuously until he lost his medical coverage in his junior year of college, at which point he felt that he was doing better.  (Id. at 17:5–18:18, 19:4–13.)  In his senior year of college, Dr. Morris prescribed him Adderall to control a newly-diagnosed condition of attention deficit disorder.  (Id. at 18:20–20:6.)  He took Adderall until sometime in 2010 or 2011.  (Id. at 20:7–21.)

Plaintiff remained off all medication until approximately February 2011, when Dr. Morris prescribed him Zoloft, Cesperal, and Buspirone.  (Id. at 21:6–22:22.)  He took these medications for about four months, but stopped because he did not have medical insurance and the money was coming out of his pocket.  (Id. at 22:22–23:17.)  He has not taken any medication since then.

**B.**  **Plaintiff's Employment with CEC**

Plaintiff applied to become a correctional officer at CEC in early 2010 and received an interview with Deputy Warden Colucci.  (Id. at 29:25–30:4.)  At the close of the interview, he was hired and sent to Human Resources to fill out paperwork.  (Id. at 30:2–18.)  While in Human Resources, Plaintiff did not reveal that he had any type of disability.  (Id. at 30:21–31:10.)  Although he was given a document entitled "Invitation to Self-Identify for Affirmative Action Purposes," he did not identify himself as "an individual with a disability."  (Id. at 44:6–17, 45:3–11.)

Plaintiff officially began employment with CEC as a correctional officer on May 3, 2010.  (Def.'s Mot. Summ. J., Ex. D)  He began his training with a class of fifteen others for approximately one month, with two weeks in the classroom and two weeks in the prison.  (Id. at 32:17–33:12.)  During that time, he learned about policies and procedures in different units

2

within the prison.  (Id. at 33:15–34:3.)

When his training was completed, Plaintiff was assigned to the "first shift" (7:45 a.m. to 4:00 p.m. Monday to Friday) for one month and he worked in multiple locations.  (Id. at 35:14–36:15.)  After the first month, he was assigned to the "third shift" (12:00 p.m. to 8 a.m.), which also involved Plaintiff's presence at varying locations.  (Id. at 37:3–38:23.)  In the summer of 2010, he was assigned to Unit 7 for a month or two because strong officers were needed.  (Id. at 37:21–25.)  Finally, in August or September 2010, he was assigned to the "second shift," which worked 4:00 p.m. to midnight, where he stayed until his termination.  (Id. at 38:25–21.)

Shortly after transferring to the second shift, Plaintiff was regularly assigned to the Special Management Unit ("SMU").  (Id. at 46:19–47:1.)  The SMU had two blocks.  (Id. at 60:17–20.)  The A Block housed juveniles, while the B block housed "[u]pstate, very high profile guys, dangerous, i.e., extremely dangerous."  (Id. at 60:23–25.)  The officers assigned to the SMU were deemed to be "strong enough, good thorough officers" and they received additional training on the policies and procedures unique to that unit.  (Id. at 59:3–60:11.)  Plaintiff worked in the SMU almost every night, with only rare assignments to other units.  (Id. at 61:23–62:25.)  Plaintiff's sergeant on SMU was Sergeant Justin Wood, who supervised all the correctional officers assigned to that unit.  (Id. at 56:21–57:25.)

C.      Re-emergence of Plaintiff's Depression and Plaintiff's Leave of Absence

Plaintiff became involved with a woman named Rachel DiOrio, a fellow correctional officer, and, in October 2010, the two were engaged.  (Id. at 65:15–66:6.)  In December 2010 or early January 2011, Plaintiff broke off the engagement when he learned that Ms. DiOrio was doing drugs and cheating on him with former female inmates.  (Id. at 66:8–69:12.)  Shortly

thereafter, Plaintiff was called in for an investigation by Captain John McCarthy and Investigator Keith Heyward regarding his relationship with Ms. DiOrio.  (Id. at 78:21–85:3.)

These events precipitated Plaintiff's relapse into depression.  (Id. at 76:21–77:11.)  He became very emotional, crying in his car, experiencing mood swings, losing an excessive amount of weight, acting irritable with friends, cutting off contact with family and friends, and isolating himself at home.  (Id.)  As a result, Plaintiff took vacation from January 6 through January 9, 2011, and a sick day on January 10, 2011.  (Id. at 71:5–8.)  He returned to work on January 13 and 14, but then called out sick again on January 15.  (Id. at 78:9–17.)   From January 16 to January 30, 2011, Plaintiff worked all of his assigned shifts, but then called out sick again on January 31 and February 1 due to his depression.  (Id. at 90:3–21.)  Although he returned to work on February 2, he was then out again for almost the next two weeks because his depression "was really hitting [him] hard."  (Id.)

In early February of 2011, Plaintiff was taken by ambulance to the Lower Bucks Crisis Center.  (Id. at 98:20–101:15.)  According to the Emergency Department records, Plaintiff had used cocaine the day prior and, on the day of his hospitalization, got into a domestic dispute with his mother and stepfather.  (Def.'s Mot. Summ. J., Ex. E.)  When the ambulance arrived he was under the influence of alcohol, was crying badly, and had been pepper sprayed by his stepfather.  (Id.; Dove Dep. 100:14–19.)  He remained at the crisis center for four to five hours, spoke to a psychiatrist, and was given a Xanax before being released to his father's care.  (Dove Dep. 100:14–101:2, 104:13–23.)  Upon release, he returned to his father's house and sought follow up care with Dr. Morris.  (Id. at 104:21–105:7.)  Dr. Morris increased his dosage in Zoloft and gave him Cesperal.  (Id. at 105:19–106:9.)  After approximately a week and a half on the medications,

he began to feel some improvement and he continued to take them for a couple of months.  (Id. at 106:10–21.)

On February 8, 2011, Plaintiff requested a leave of absence due to his depression and anxiety.  (Id. at 64:20–65:12.)  He went to Jeff Bergin in Human Resources at CEC to request time off because he was "mentally suffering" and felt that he could not perform his job.  (Id. at 94:25–96:2.)  Mr. Bergin then looked up Plaintiff's date of hire and discovered that Plaintiff did not yet qualify for FMLA leave.  (Def.'s Mot. Summ. J., Ex. F, Dep. of Jeffrey Bergin ("Bergin Dep."), 15:18–20, June 12, 2013.)  Accordingly, Bergin told him about union leave without pay and gave him a copy of the instructions on how to request it.  (Id. at 15:20–24.)  Mr. Bergin advised Plaintiff to write down his request for leave on a piece of paper for submission.  (Dove Dep. 97:10–16; Bergin Dep. 16:1–3.)  Plaintiff wrote down his request right then and there and Bergin brought the letter to his manager, Debra Gerstenberg, who in turn brought it to Chief of Security Michael Gannon.  (Dove Dep. 95:4–11; Bergin Dep. 16:3–7, 17:6–18:15.)  Ms. Gerstenberg then returned and told Bergin the leave had been approved, after which Bergin emailed a copy of the approval to Plaintiff.  (Bergin Dep. 19:5–12.)  Chief Gannon's approval signature was dated February 8, 2011, the same day that Plaintiff requested it.  (Pl.'s Resp. Opp'n Summ. J., Ex. C.)  Plaintiff understood that this leave was not covered by the FMLA.  (Dove Dep. 113:9–12.)

**D.**  **Plaintiff's Return to Work on Light Duty**

Plaintiff received a doctor's note, dated February 10, 2011, clearing him to return to work as of February 16, 2011, on a light duty basis with no inmate contact.  (Def.'s Mot. Summ. J., Ex. I; Dove Dep. 115:24–116:21.)  Plaintiff understood light duty to be either in training or in the

mailroom.  (Dove Dep. 116:22–117:8.)

Just prior to his return to work on February 15, 2011, Plaintiff spoke with Bergin notifying him that he would be returning and indicating that he needed light duty.  (Id. at 117:9–118:15.)  Bergin testified that he would have talked to Chief Gannon at the time to inquire into any light duty positions that Plaintiff could fulfill, but would not have told Gannon anything about Plaintiff's medical condition other than his need for no inmate contact.  (Bergin Dep. 20:6–21.)  Ultimately, Plaintiff was assigned a Monday to Friday job handling ACA accreditation training where he was supervised by Lieutenant Lisa Gannon and Lieutenant Leo Levandowski.  (Id. at 118:16–119:3.)  Plaintiff continued to follow up with his nurse practitioner on a weekly basis.  (Id. at 119:4–120:9.)

During his light duty tenure, Plaintiff claims to have been subject to harassment from Chief Michael Gannon.  (Id. at 140:19–25.)  One day, while Plaintiff was at work, he broke down in tears because the stress was still getting to him and he went home.  (Id. at 141:5–19.)  The next day, Chief Gannon called him into his office and said that he heard Plaintiff was acting "a little eccentric, a little crazy down in training . . . . [Y]ou are going to be working in the mailroom from now on."  (Id. at 142:4–11.)  When Gannon inquired into what Plaintiff was going through, Plaintiff responded that it was none of his business.  (Id. at 142:22–25.)  Plaintiff claims that he heard other correctional officers saying that he was out "because he's crazy."  (Id. at 135:21–136:4.)

Afterwards, when Plaintiff was assigned to the mailroom, he alleges that there were other incidents of harassment.  (Id. at 143:17–144:4.)  For example, Plaintiff indicated that Gannon "rode him" about having his hair cut, about having facial hair, and about using his cell phone

while working.  (Id. at 144:7–23, 146:22–149:24.)  He also claimed that he was doing three

people's jobs in the mailroom and running around frantically, but was reprimanded in front of

everyone by Lieutenant Durling and later by Chief Gannon for his pace.  (Id. at 144:7–16.)

Plaintiff believed that Gannon's behavior was motivated either by his medical condition or by his

request for leave.  (Id. at 145:17–11.)  Other than the one comment earlier on about Plaintiff

acting eccentric and crazy, however, Plaintiff could not recall any other comments by Gannon

about his medical condition.  (Id. at 146:12–21.)   Moreover, Plaintiff did not recall any other

supervisors or member of administration treating him in a hostile manner while he was on light

duty.  (Id. at 149:25–150:3.)

      **E.**     **Plaintiff's Return to Fully Duty Work**

     On April 13, 2011, Plaintiff received a medical note from Dr. Morris's office indicating

that he was cleared to return to full-duty work at the prison.  (Id. at 120:14–121:20; Def.'s Mot.

Summ. J., Ex. J.)  Plaintiff provided this note to Jeff Bergin in Human Resources and then

reported to roll call as instructed.  (Dove Dep. 124:21–125:12.)  He was not returned

immediately to his assignment in SMU, but rather was assigned to administration where he was

responsible for delivering files for the Commonwealth.  (Id. at 127:12–128:3.)  Plaintiff then

requested that Sergeant Wood reassign him to the SMU.  (Id. at 128:25–129:6.)  A couple of days

later, he was transferred back to SMU, where Sergeant Wood was his supervisor just like before.

(Id. at 131:6–22.)

     Upon his return to the SMU, Plaintiff was assigned to the control room since there were

new officers assigned to the A and B sides.  (Dove Dep. 131:23–132:6.)  He believed that was

unfair because he was a senior officer there at the time and the officers there were incapable or

weaker.  (Id. at 132:22–133:8.)  Plaintiff approached Sergeant Janet Cooper[1] about this and asked her why he was being assigned to unit 5, to which she replied, "don't worry, you are not off SMU."  (Id. at 162:16–23.)  On a second occasion, Plaintiff again approached Sergeant Cooper about why he was put in the control room and Cooper said, "you don't question me.  I'm the 09 [assistant shift supervisor], Wood's not here.  You go serve your post."  (Id. at 151:11–14.)  Plaintiff then said "this is the second time you screwed me," and gestured his hand at her in a dismissive wave.  (Id. at 151:15–25, 166:8–14.)  At that point, Lieutenant Juisti, who was with Sergeant Cooper at the time, said, "that's it, he is crazy.  You will never work that post again.  You will never be back on SMU again ever again."  (Id. at 151:15–19.)  Sergeant Wood later testified that he observed Sergeant Cooper call Plaintiff "crazy "and a "nut case" in front of other correction officers and in the presence of Lieutenant Juisti, after which Juisti proceeded to call him crazy as well.[2]  (Pl.'s Resp. Opp'n Summ. J., Ex. G., Dep. of Justin Wood ("Wood Dep."), 79:7–21, Mar. 22, 2013.)  Wood said he confronted Cooper about her comments about Plaintiff being crazy and she just laughed him off and said "who cares, he's a f—ing psycho."  (Id. at 86:25–22.)

        At the direction of his union representative, Plaintiff then prepared an incident report

---

[1]  Sergeant Cooper testified that she had only heard through an email from HR that Plaintiff was out on medical or FMLA leave.  (Def.'s Mot. Summ. J., Ex. K., Dep. of Janet Cooper ("Cooper Dep."), 16:5–17:22, May 14, 2013.)  When Plaintiff came back, Sergeant Cooper did not know of any modifications to his schedule or his abilities; she did not recall him coming back on light duty.  (Id. at 20:9–15.)  Other than casual rumors which she disregarded, she never heard anyone talk about Plaintiff suffering from mental illness.  (Id. at 15:8–16:4.)

[2]  Notably, Lieutenant Juisti denied ever calling Plaintiff crazy or hearing an other corrections officers or sergeants refer to him as crazy.  (Pl.'s Resp. Opp'n Summ. J., Ex. H, Dep. of John Juisti ("Juisti Dep."), 30:4–24, Aug. 30, 2013.)

regarding the altercation between himself and Sergeant Cooper.  (Dove Dep. 177:5–178:1; Def.'s Mot. Summ. J., Ex. L.)  Likewise, Sergeant Cooper submitted an incident report regarding these events because she felt as if Plaintiff's yelling and raising his hand to her was threatening. (Cooper Dep. 24:5–25:17; Def.'s Mot. Summ. J., Ex. M.)  The report was turned over to "Investigations" to determine the appropriate level of discipline.  (Cooper Dep. 37:5–38:5.) Ultimately, Plaintiff was issued a disciplinary action for insubordination and received a one day suspension.[3]  (Dove Dep. 170:8–16; Def.'s Mot. Summ. J., Ex. N.)  He was notified of the disciplinary action through the Investigator's office.  (Dove Dep. 170:17–19.)  This discipline was issued in accord with the prison's progressive discipline policy, although the first two levels of discipline—verbal discipline and written discipline—were skipped in favor of a one-day suspension.  (Def.'s Mot. Summ. J., Ex. O.)  Plaintiff appealed this discipline through his Union Shop Steward John Braun.  (Dove Dep. 170:20–171:5.)

After the May 10, 2011 write-up, Plaintiff was summoned to Chief Gannon's office. (Dove Dep. 179:15–180:3.)  Gannon discussed Plaintiff's behavior and would not let him tell his side of the story.  (Id.)  Gannon stated that there were no permanent posts at SMU and he could be assigned to a different unit every day, but when Plaintiff argued to the contrary, Gannon ignored him.[4]  (Id. at 180:5–24.)  After that meeting, Plaintiff apologized to Cooper for what

---

[3]  In his deposition, Plaintiff testified that two other Sergeants, Meyer and Bird, informed him that he acted appropriately and that the write-up was unjustified.  (Dove Dep. 168:12–169:10.)  Plaintiff's testimony about what others said to him regarding the incident, however, is hearsay and may not be considered by this Court on summary judgment review.

[4]  Plaintiff contends that during this meeting, he complained of Cooper's and Juisti's discriminatory remarks.  Nothing in cited portions of Plaintiff's testimony indicates that he made any such complaints.

happened because it was misinterpreted and Cooper responded that, "I know it was misinterpreted but I had to write you up because of Juisti." (<u>Id.</u> at 181:18–23.)

Following this incident, Plaintiff claims that Lieutenant Juisti was "careful" around him and that Juisti's body language and the way he acted around him suggested he believed Plaintiff to be a weak officer. (<u>Id.</u> at 187:8–25.) Lieutenant Juisti was snippy, disrespectful, and did not treat Plaintiff with the same professionalism with which he treated others. (<u>Id.</u> at 188:3–19.)

### F. Plaintiff's Requests for Additional Days Off

After Plaintiff's return to full duty in April 2011, he requested "vacation days here and there." (<u>Id.</u> at 192:2–7.) He took one vacation day on May 8, 2011, which, according to Plaintiff, "they fought" him for because they didn't think he had vacation time. (<u>Id.</u> at 192:13–20.) He claimed that the vacation time was for a medical reason, but he did not tell anybody that was why he was using it. (<u>Id.</u> at 192:16–193:1.)

In June, Plaintiff took two vacation days on the 22nd and the 25th, purportedly for medical reasons, but he did not tell anybody he needed those days because of a medical reason. (<u>Id.</u> at 193:2–13.) Plaintiff explained, "it was none of their business. They were aware of my condition. I had medical documentation. There was no need to tell my shift supervisor. It is a HIPAA violation. If I want to disclose it, I can." (<u>Id.</u> at 193:14–18.) As to the first day—June 22—he stated that he told shift commander Lieutenant Reimel, "I'm low on vacation days, I think I'm almost out. And I need this day, I have something coming up." (<u>Id.</u> at 264:19–265:3.) Lieutenant Reimel approved it, but remarked that her supervisor may not. (<u>Id.</u> at 267:25–268:19.) Nonetheless, that vacation day was approved without any problem. (<u>Id.</u> at 268:21–23.) As to the June 25, Plaintiff received a "no call, no show" write up. (<u>Id.</u> at

10

194:20–22.)  Shortly thereafter, however, that vacation day was also approved.[5]  (Id. at

194:23–195:7.)

### G.        The Incident of June 27, 2011

On June 27, 2011, Plaintiff was assigned to work in the SMU control room.  (Id. at

287:12–288:23.)  CEC's Post Order 30 outlines CEC's policy regarding the security of various

doors at the facility, including control room doors, as follows:

> Unlock doors as needed.  The Control Room door, Cage door and all day room doors shall remain **LOCKED** at all times.  Open one door at a time.  *The key shall not be left in the Control Room Door lock.*

(Def.'s Mot. Summ. J., Ex. R (emphasis in original).)  Plaintiff explained that he was responsible

for opening doors on both A and B side, including controlling the doors, filling out paperwork,

and cuff and key count.  (Dove Dep. 296:3–12.)  Within the control room was a panel of buttons

that could be used by an officer to open and close doors to access the A side from the main

---

[5]  Plaintiff cites to the deposition testimony of Union Representative John Braun for the proposition that "the likely rationale for the difficulty Plaintiff had in taking just a few days to treat his depression is CEC management's stance on medical leave: 'they're not happy with [medical leave] because obviously, it causes overtime.'" (Pl.'s Resp. Opp'n Summ. J. 8 (citing Ex. K, Dep. of John Braun ("Braun Dep."), 107:16–22, Aug. 13, 2013.).)  When read in context, however, Mr. Braun was not opining on the reasons for any action against Plaintiff.  Indeed, Mr. Braun acknowledged that there was no particular bias against people who validly used medical leaves:

> Q.    Did you ever hear Mario Colucci, the Warden, anybody in management at CEC say that they want to get people or fire people or get rid of people that take FMLA leave?
>
> A.    No.  Now they're not happy with it because obviously, it causes overtime and stuff like that.  Some people do abuse it.  I'm not saying they go out, you know, and say get people fired that actually have a medical disability or anything like that.

(Id. at 107:16–108:1.)

hallway and the individual cell doors on both tiers of the unit.  (Id. at 290:16–291:23.)  CEC policy provides that the control room officer should remain in the control room until properly relieved.  (Def.'s Mot. Summ. J., Ex. R.)

Plaintiff testified that once someone got into the dayroom, they would have direct access to the door into the SMU control room.  (Dove Dep. 292:23–293:2.)  If someone walked into the control room from the A side, they would have unfettered access to walk through the control room and exit out of another doorway on the B side.  (Id. at 295:7–18.)  Nonetheless, Plaintiff understood the CEC policy to mean only that the doors needed to remain shut, but not necessarily locked, depending on the circumstances.  (Id. at 297:14–303:6.)

At approximately 11:00 p.m. on June 27, 2011, while Plaintiff was working in the control room, Plaintiff was involved in an incident where an inmate was able to gain access to the control room.  Nurse Little arrived to administer pills to the inmate.  (Id. at 314:4–315:8.) Plaintiff buzzed her in with her cart.  (Id. at 315:12–316:5.)  At that time, an inmate became unruly and Nurse Little's escort left her side to assist another correctional officer with the inmate. (Id. at 316:6–24.)  The control room doors were unlocked because, according to Plaintiff, all the officers were going in and out of the control room to do their roster counts and new rosters.  (Id. at 317:1–12.)  As the nurse was unattended, Plaintiff told her to come in to the control room through the B side control room door.  (Id. at 322:6–18.)  Once she entered, however, he did not lock the B side door to the control room.  (Id. at 322:19–24.)  When Nurse Little requested to go out to do her pill call on A side (juveniles), the top-tier or max prisoners were out of their cells "rec'ing" and the lower tier inmates were in their cells.  (Id. at 323:5-22, 324:16–325:5.) Therefore, Nurse Little began giving pill call through the slot in the control room door.  (Id. at

325:7–21.)

At that point, an inmate, Omar Hooks, tried to come through the control room door to "holler" or hit on Nurse Little.  (Id. at 327:18–328:1.)  While trying to push through the door and meeting resistance from Plaintiff, Hooks said, "You mother f—er, why you got to do that?  Come on, dog, I thought we were boys.  I was just trying to holler at her."  (Id. at 345:20–346:8.)  Hooks did not get very far because the door opened and Plaintiff pushed him back.  (Id. at 332:20–24.)  Once he got Hooks out of the doorway, Plaintiff came out from the control room and told Hooks to get past the "gun line," which is a stripe three feet in front of the door that an inmate is not allowed to pass.  (Id. at 333:1–7.)  He then called his unit manager, Janet Cooper, and she came on to the unit and called code black because an inmate had made contact with a correctional officer.  (Id. at 334:14–19.)  Plaintiff knew that an inmate trying to get into the control room was a "big deal" because there are thirty-two buttons in there "that control – it's the brain of that unit."  (Id. at 346:19–347:2.)  The incident was captured on the prison's video surveillance system.  (Def.'s Mot. Summ. J., Ex. V.)

Following these events, Plaintiff was required to prepare an incident report because a code black had been called.  (Dove Dep. 348:21–349:5; Def.'s Mot. Summ. J., Ex. W.)  Both John Braun and Lieutenant Juisti were present while he wrote the report.  (Id. at 349:6–350:16.)  After he prepared the report, he gave it to Juisti, who was shift commander.  (Id. at 350:71–351:2.)  He was then relieved of his post and went home.  (Id. at 354:1–6.)  Sergeant Cooper, who was assigned as the SMU sergeant for that shift, also completed a disciplinary inquiry form related to the incident.  (Def.'s Mot. Summ. J., Ex. X; Cooper Dep. 30:2–9.)  She did so because Plaintiff "was assigned to special housing unit, special management unit, left the

13

control door open and an inmate was able to access the control room." (Cooper Dep. 30:10–14.) Other than preparation of this document, Sergeant Cooper had no further involvement regarding this incident or the subsequent disciplinary process. (Id. at 35:17–21, 37:6–11.) Notably, at her deposition, Sergeant Cooper barely remembered the incident, could not recall if there was any altercation between Plaintiff and the inmate, and believed that the report was written only for Plaintiff's failure to not secure the door. (Id. at 36:2–16.) She explained that because the special housing unit housed the worst of the worst inmates, allowing any access to the control room was a serious offense. (Id. at 37:21–38:6.)

Plaintiff testified that other officers would often leave control room doors either unlocked or open and that Sergeant Cooper had, in the past, observed a control room door being opened. (Dove Dep. 375:23–376:9.) He specifically commented on one incident where Sergeant Cooper had an inmate in the control room cleaning and she left the inmate in there, while another correctional officer was inside as well. (Id. at 376:13–377:5.) The officer who was assigned to the control room at the time did not receive a suspension or termination. (Id. at 377:6–9.) Plaintiff also testified that sergeants were all aware that control room doors were left open "because half the time the control room officer would stick a water jug between the control room door. The sergeant would go up, you know you're not supposed to do this, and wouldn't write them up; would just say can't do this, don't do that, whatever." (Id. at 378:6–12.) The control room officers were never terminated. (Id. at 378:13–17.)

Other correctional officers believed that control room doors were regularly left open and supervisors knew about it. John Braun testified that ranking officers must have known of control room doors being cracked open as they would mentioned at roll call that control room doors

14

should be locked and secured.  (Braun Dep. 19:19–20:16.)  Other than that, however, Braun had

no firsthand knowledge that any sergeant, lieutenant, or captain was aware that control room

doors were unsecured.  (Id. at 71:18–72:8.)  CO Griffin testified that although the control room

door was supposed to be locked, he was aware of many instances where it was left unlocked and

the supervisors knew about it.  (Pl.'s Mot. Summ. J., Ex. P, Dep. of Donnie Griffin ("Griffin

Dep."), 21:4–24:9, Aug. 13, 2013.)  Indeed, Griffin had an incident where he left a control room

door unlocked and received a write-up and suspension, but only because he had a prior discipline

which jumped him to the suspension level.  (Id. at 24:10–25:24.)  Griffin was not the control

room officer at the time and the officer who was in charge of the control room was not

terminated.  (Id. at 35:22–37:20.)  Finally, Lieutenant Juisti indicated that during the time he

worked at CEC, he was aware of control room operators leaving the door unlocked, but it was

not often.  (Juisti Dep. 38:24–39:16.)

###    H.    The Investigation and Termination of Plaintiff

Upon review of the surveillance video, Investigations Supervisor Keith Heyward

conducted an investigation of the June 27, 2011 incident.  (Def.'s Mot. Summ. J., Ex. Y, Dep. of

Keith Heyward ("Heyward Dep."), 38:4–15, 39:16–40:13, June 12, 2013.)  Heyward noted that

the inmate had pushed his way into the control room, Plaintiff pushed him back out, and then

Plaintiff walked a couple of feet outside the control room to continue his conversation with the

inmate.  (Id. at 39:16–40:13.)  He explained that leaving a control room door unlocked, even if an

officer is inside, constitutes a violation of policy that is a terminable offense.  (Id. at 41:2–15.)

This was corroborated by Investigator Donald Beese—who indicated that leaving the control

room door open is a terminable offense without any prior discipline or corrective action.  (Def.'s

Mot. Summ. J., Ex. Z, Dep. of Donald Beese ("Beese Dep."), 27:4–12, May 14, 2013.)  It was

likewise corroborated by Deputy Warden of Security Mario Colucci—who stated that breach of

security for leaving the door open is a terminable offense.  (Def.'s Mot. Summ. J., Ex. S, Dep. of

Mario Colucci ("Colucci Dep."), 27:18–28:9, May 14, 2013.)  Deputy Warden Colucci further

noted that he recalls other employees who committed a similar breach of security being

terminated for their offenses.  (Id. at 28:10–24.)

    Upon completion of his investigation, Heyward prepared a disciplinary action form.

(Heyward Dep. 52:9–24.)  He explained that this form is routinely completed after the

determination of a violation in which the disciplinary action was agreed to by the Warden.  (Id. at

54:18–55.)  He further indicated that he did not make the decision to terminate Plaintiff, but

rather was instructed by the Warden to implement a termination.  (Id. at 53:20–54:4,

55:2–56:18.)  In this case, Captain McCarthy gave Heyward the directive to type up the

disciplinary action with the termination.  (Id.. 58:6–22.)  At no point prior to Plaintiff's

termination did Heyward know that Plaintiff suffered from any medical condition.  (Id. at

61:22–62:1.)

    Deputy Warden Colucci testified that he reviewed Heyward's investigative report and

personally reviewed the video footage, but the ultimate authority to terminate came from the

Warden.  (Colucci Dep. 33:24–8, 42:23–43:1.)  Although he also had no input into conducting

the investigation, he recommended to Warden Green that Plaintiff be terminated after

considering both the investigative report and the video footage.  (Id. at 34:9–12, 43:2–44:10.)

Notably, at the time of his deposition, Warden Green had no recollection of Plaintiff or his

termination.  (Def.'s Mot. Summ. J., Ex. AA, Dep. of Frank Green ("Green Dep."), 51:17–52:14,

16

Aug. 21, 2013.)

Chief Michael Gannon testified that, although he was made aware of Plaintiff's conduct and the investigation, he had no part in issuing the disciplinary action that resulted in Plaintiff being terminated. (Def.'s Mot. Summ. J., Ex. H, Dep. of Michael Gannon ("Gannon Dep."), 45:6–46:12, May 10, 2013.) Testimony from other officers, however, indicated that the Chief of Security would usually have been within the chain for review for such situations. Warden Green testified that, typically, the investigator would make a recommendation to the Chief of Security regarding discipline, which, in this case, would have been Chief Gannon. (Green Dep. 53:22–24.) Similarly, Heyward indicated that the Deputy Warden generally reviews disciplinary actions and provides a statement or findings to the Warden. (Heyward Dep. 24:10–20.) Beese likewise confirmed that usually the Captain, Chief, Deputy Warden, and Warden have a group meeting about the appropriate level of discipline. (Beese Dep. 17:21–18:16.) Finally, Colucci indicated that the Chief of Security—again, in this case, Gannon—is typically responsible for issuing discipline to corrections officers. (Colucci Dep. 16:10–14.) He further explained that there are three steps in the termination process, starting with Chief of Security Gannon, then to himself as Deputy Warden, and finally to Warden Green. (Id. at 44:15–45:6.)

On July 1, 2011, Plaintiff received an email from Jeff Bergin and a voicemail from Captain McCarthy. (Dove Dep. 355:3–9.) The email asked Plaintiff to contact Captain McCarthy as soon as possible. (Id. at 355:10–19.) Via a five minute phone conversation, Captain McCarthy then told Plaintiff that he was terminated. (Id. at 355:20–356:11.)

Plaintiff was then instructed by his union representative to talk to Captain McCarthy about this decision. (Id. at 358:18–22.) A couple of days after he was terminated, Plaintiff spoke

17

to McCarthy and said that his termination was unfair, especially when he was just trying to do his

job with others abandoning their posts, and other officers having had much greater infractions.

(Id. at 359:7–360:23.)  McCarthy called him back after checking into his allegations and said, "I

believe it's just sour grapes."  (Id. at 361:2–10.)  Thereafter, with the assistance of Braun,

Plaintiff wrote a grievance to Warden Green.  (Id. at 361:19–362:18; Def.'s Mot. Summ. J., Ex.

BB.)  In the grievance, Plaintiff set forth a detailed version of the events as he perceived them,

explained why his termination was unfair, and complained of the unethical nature in which his

termination was carried out.  (Def.'s Mot. Summ. J., Ex. BB.)  Plaintiff did not suggest, at any

point, that his termination was motivated by his disability.  (Id.)

> On July 11, 2011, Warden Green denied Plaintiff's Grievance as follows:
>
> I have reviewed your Disciplinary Write-Up, dated 6/27/2011, and all reports and
> video, related to the incident, which takes place in the SMU Control Room.  I have
> also reviewed your Appeal, with regard to the Incident, and your Disciplinary history.
>
> It is apparent; you failed to keep the Control Room Door properly secured, which is
> a serious breach of Security, and in doing so compromised the safety of yourself and
> others.
>
> Therefore your Grievance and request for Reinstatement are denied.

(Def.'s Mot. Summ. J., Ex. CC.)

### I.    **Procedural History**

On August 2, 2012, Plaintiff initiated the present litigation against Defendant

Communication Education Centers, Inc., d/b/a George W. Hill Correctional Facility, Delaware

County Prison.  The Complaint set forth three causes of action as follows: (1) discrimination and

retaliation under the Americans With Disabilities Act; (2) interference and retaliation under the

Family Medical Leave Act; and (3) discrimination and retaliation under the Pennsylvania Human

Relations Act.

Defendant moved for summary judgment as to the entirety of this Complaint on September 13, 2013.  Plaintiff filed a Response on October 7, 2013, and Defendant filed a Reply Brief on October 30, 2013.  The Court now turns to the merits of this Motion.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact,

it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325.  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

## III.   DISCUSSION

Defendant currently seeks dismissal of all of Plaintiff's claims under Federal Rule of Civil Procedure 56.  In his Response, Plaintiff withdraws his claims pursuant to the FMLA and proceeds only on his claims under the ADA and the PHRA.  (See Pl.'s Resp. Opp'n Summ J. 15 n.16.)  Accordingly, the Court discusses only these causes of action.

### A.   ADA and PHRA Discrimination Claims[6]

The ADA was enacted in 1990 to "prevent otherwise qualified individuals from being discriminated against in employment based on a disability." Gaul v. Lucent Techs. Inc., 134 F.3d

---

[6] Although they are not bound to do so, Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts, including the ADA. Salley v. Circuit City Stores, Inc., 160 F.3d 977, 979 n.1 (3d Cir. 1998) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)). This is due in part to the substantial similarity between the definition of "handicap or disability" under the PHRA and the definition of "disability" under the ADA. Id. (citing Fehr v. McLean Packaging Corp., 860 F. Supp. 198, 200 (E.D. Pa. 1994)).  The United States Court of Appeals for the Third Circuit has held that a claim under the PHRA is coextensive with a claim under the ADA. Id. (citing Kelly, 94 F.3d at 105).  Accordingly, the Court addresses the ADA and PHRA claims jointly.

576, 579 (3d Cir.1998) (citing 29 C.F.R. pt. 1630, app. at 347–48 (1997)).  Under the ADA, employers are prohibited from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

In reviewing a motion for summary judgment to determine if there is a genuine issue of material fact concerning whether an employer illegally discriminated against an employee, the court must apply the test articulated by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) and refined in <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248 (1981).  In <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), the United States Supreme Court set forth the precise framework for analyzing a claim based upon impermissible discrimination where, as here, there is no direct evidence of discrimination.

First, the plaintiff must prove by a preponderance of evidence a prima facie case of discrimination.  <u>McDonnell Douglas</u>, 411 U.S. at 802.  A prima facie case is established by showing three elements.  First, the plaintiff must prove that he is disabled within the meaning of the ADA.  <u>Turner v. Hershey Chocolate U.S.</u>, 440 F.3d 604, 611 (3d Cir. 2006) (citing <u>Buskirk v. Apollo Metals</u>, 307 F.3d 160, 166 (3d Cir. 2002))  Under the ADA, a "disability" is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," 42 U.S.C. § 12102(2)(A), "a record of such an impairment," <u>id.</u> § 12102(2)(B), or "being regarded as having such an impairment."  <u>Id.</u> § 12102(2)(C).  Second, the employee must establish that she is a qualified individual within the meaning of the ADA.  <u>Turner</u>, 440 F.3d at 611 (citing <u>Buskirk</u>, 307 F.3d at 166; <u>Gaul</u>, 134 F.3d at 580). A qualified individual is "an

individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  Finally, the plaintiff must establish that he has suffered an "adverse employment decision as a result of discrimination."  Turner, 440 F.3d at 611 (citing Buskirk, 307 F.3d at 166; Gaul, 134 F.3d at 580). An "adverse employment decision" includes an employer's failure to reasonably accommodate the employee's disability.  Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004) (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999)).

If the plaintiff succeeds in establishing a prima facie case of discrimination, a "presumption" of discrimination arises and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action.  Id. at 802–03.  To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons."  Burdine 450 U.S. at 254.  The inquiry concerning whether the defendant has met its burden of production "can involve no credibility assessment," since "the burden-of-production determination necessarily *precedes* the credibility-assessment stage." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993) (emphasis in original)).  The defendant satisfies its burden of production, and rebuts the plaintiff's prima facie showing of discrimination, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons.  Id.

Finally, if the employer meets its burden of production, the presumption of discrimination created by plaintiff's prima facie case "drops out of the picture."  Id. at 511 (citing McDonnell

22

<u>Douglas</u>).  In order to establish that the defendant is liable for illegal employment discrimination, the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the real reason for the adverse employment action at issue.  <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994).  "Liability cannot be established upon a jury's mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the jury's *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion."  <u>Mitchell v. Miller</u>, 884 F. Supp. 2d 334, 370–71 (W.D. Pa. 2012) (emphasis in original) (citing <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 519 ("It is not enough, in other words, to *disbelieve* the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.") (emphasis in original)).  "Nevertheless, evidence suggesting that an employer's proffered reasons for an adverse employment action are false, when coupled with a plaintiff's prima facie case, may sufficiently undermine the employer's credibility to enable a reasonable trier of fact to conclude that illegal discrimination has occurred."  <u>Mitchell</u>, 884 F. Supp. 2d at 371 (citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147–48 (2000)).

In the present case, Defendant contends that Plaintiff's claim must fail both at the prima facie case stage and at the pretext stage.  The Court, however, finds that even assuming *arguendo* that Plaintiff could meet his prima facie case, Defendant has articulated a legitimate, non-discriminatory reason for terminating Plaintiff, which Plaintiff has failed to establish as pretext.[7]

---

[7]  The Third Circuit has acknowledged that the causation question "is not easily distinguishable" from the pretext question.  <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 286 (3d Cir. 2000).  To that end, it has remarked that "evidence supporting the *prima facie* case is often helpful in the pretext stage, and nothing about the <u>McDonnell Douglas</u> formula requires us to ration the evidence between one stage or the other."  <u>Id.</u>  In this case, the evidence regarding the causation inquiry and the evidence regarding legitimate non-discriminatory reasons/pretext inquiry substantially overlaps. Accordingly, for clarity purposes, the Court resolves this issue at

Accordingly, the Court focuses on this prong of the <u>McDonnell Douglas</u> test.  As noted above,

once a plaintiff sets forth a prima facie case of discrimination, the burden shifts to the employer

to set forth a legitimate, non-discriminatory reason for the challenged adverse employment

actions.  All the employer must do at this juncture is introduce admissible evidence that, if taken

as true, would "permit a finding that the challenged employment action was taken for legitimate,

nondiscriminatory reasons."  <u>Mitchell</u>, 884 F. Supp.2d at 370 (emphasis in original).

In the present case, Defendant has done so.  As set forth in detail above, Plaintiff, by his

own admission, failed to secure the SMU control room door, thereby creating an opportunity for

an inmate to gain access to the controls to operate each door within the unit.  CEC's Post Order

30 outlines CEC's policy regarding the security of various doors at the facility, including control

room doors, as follows:

> Unlock doors as needed.  The Control Room door, Cage door and all day room doors
> shall remain **<u>LOCKED</u>** at all times.  Open one door at a time.  *<u>The key shall not be
> left in the Control Room Door lock.</u>*

(Def.'s Mot. Summ. J., Ex. R.)  Numerous witnesses testified that the failure by the control room

officer to secure the control room door is a terminable offense in and of itself.  Investigations

Supervisor Keith Heyward testified as follows:

> Q.      Is having a door unlocked for the control room, if an officer is inside, in and
>           of itself a violation of any sort of policy?
>
> A.      Yes.
>
> Q.      Is that in your eyes a terminable offense?
>
> A.      It has been, yes.

---

the pretext stage.  By doing so, however, the Court does not make any finding that Plaintiff has
satisfied his burden of proving causation.

Q.   When you say it has been, does that mean sometimes it is, sometimes it isn't?

A.   No, past practice is when we do have a staff member which leaves the door either unlocked or leaves it unattended, allowing a chance for an inmate to enter, has resulted in termination.

Q.   Are there ever instances were leaving a door—I want to focus on unlocked, setting aside unattended but just looking at unlocked. Have there been instances where an employee has not been terminated where a door has been unlocked but attended?

A.   Not to my knowledge.

. . .

Q,   If Officer Dove testified that individuals, by virtue of Sergeant Cooper's supervision, were allowed to have people pass in and out of the control room while leaving the door unlocked, like nurses or medical staff, and that no one had been terminated as a result of that, would that come as a surprise to you?

A.   That would come as a surprise to me.

(Heyward Dep. 41:2–42:15.)  Investigator Donald Beese likewise testified:

Q.   Do you know if any individuals who have been accused of leaving the control room door open have not been terminated.

A.   I am not sure of that.

Q.   Not sure of the ultimate discipline?

A.   No.

Q.   Leaving the control room door open, is that a terminable offense without any prior discipline or corrective action?

A.   Yes, it can.

Q.   Just to be clear, it can be a terminable offense.  Can it also not be a terminable offense?

A.   I believe it can be a terminable offense.

(Beese Dep. 26:22–27:12.)  Finally, Deputy Warden of Security Mario Colucci remarked as

25

follows:

> Q.    So as Deputy Warden of Security during the time that you held that position, you had an understanding of the policies and procedures relating to what the correctional officers were supposed to be doing on a daily basis, right?
>
> A.    Correct.
>
> Q.    What were the policies that were violated with respect to Mr. Dove's conduct as you understand that the incident occurred?
>
> A.    Again, I would have to review the investigative report, but from what I can remember without looking at it, I think it was exactly what I said.  It was a breach of security leaving the control room door open.
>
> Q.    So, in terms of breach of Security for leaving the door open, based on your understanding of policies and procedures, is that an immediately terminable offense or is there some other level of discipline that would be appropriate in that instance?
>
> A.    No, a breach of security can—is a terminable offense.

(Colucci Dep. 27:11–28:9.)  Such testimony is sufficient for Defendant to meet its burden of establishing a legitimate, non-discriminatory reason for Plaintiff's termination.

Given this evidence, the Court finds that Defendant has met its burden of production, meaning that the presumption of discrimination created by Plaintiff's prima facie case "drops out of the picture."  St Mary's Honor Ctr., 509 U.S. at 511.  Plaintiff bears the burden of convincing the trier of fact that a discriminatory animus was the real reason for the adverse employment action at issue.  Fuentes, 32 F.3d at 765.   A plaintiff may meet her burden of showing that a defendant's proffered reason is "merely a fabricated justification for discriminatory conduct . . . either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence." Siegel v. Alpha Wire Corp., 894 F.2d 50, 56 (3d Cir. 1990) (internal quotation marks and

quotations omitted).  Although a court may not require affirmative evidence of discrimination in addition to proof of pretext, it does not change our standard for proving pretext which "places a difficult burden on the plaintiff."  Fuentes, 32 F.3d at 765.  In order to avoid summary judgment, a plaintiff must put forward "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  Id. (internal quotation and citation omitted; emphasis in the original).  In the alternative, plaintiff may point "to evidence in the record which 'allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'"  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 413 (3d Cir. 1999) (quoting Fuentes, 32 F.3d at 764).

To that end, Plaintiff puts forth two reasons for why Defendant's stated reasons for terminating Plaintiff would not be believed by a jury: (1) Chief Gannon, who had a history of bias towards Plaintiff due to his disability, made the decision to terminate Plaintiff, giving rise to an inference of pretext; and (2) the conduct that Plaintiff was terminated for has been a common occurrence throughout the CEC, yet terminations have not resulted for other individuals.  The Court addresses each pretext argument individually.

### 1.   Whether the Decision to Terminate Was Made by a Biased Decisionmaker

First, Plaintiff contends that, contrary to Defendant's assertion in this litigation, the evidence establishes that Chief Gannon—not Warden Green—made the decision to terminate Mr. Dove.  Plaintiff argues that at most, Warden Green was a "rubber stamper" and that testimony from Investigators Beese and Heyward reveals that Chief Gannon, as Chief of

Security, would "typically" be the individual to make the decision.  This fact is of great import because Chief Gannon knew of Plaintiff's medical leave, knew of Plaintiff's health issues, had called Plaintiff "crazy" after he returned from his leave, and made efforts to stop Plaintiff from taking additional time off to treat his illness.

These allegations fall far short of establishing pretext for multiple reasons.  First, the evidence simply does not give rise to even a tenuous inference that Chief Gannon, or any other officer about whom Plaintiff has made allegations of discrimination, were the ultimate decisionmakers for Plaintiff's termination.  Specifically, the evidence is as follows:

- Warden Green: Although Warden Green testified that he did not remember Plaintiff, does not recall receiving an investigative report from Investigator Heyward, and does not remember recommending Plaintiff's termination, (Green Dep. 51:11–52:14), the evidence reveals that Warden Green actually reviewed Plaintiff's appeal of his determination, reviewed the written reports, watched the video, and considered Plaintiff's history, ultimately concluding that the termination was justified.  (Def.'s Mot. Summ. J., Ex. CC.)  Warden Green also confirmed that it was within Mr. Heyward's responsibilities as Supervisor of Investigations to recommend disciplines.  (Id. at 53:22–54:24.)  He further noted that, under the general chain of authority, an investigation would be reviewed by both the Chief of Security (Gannon), and then by the Deputy Warden (Colucci), and lastly by him.  (Id. at 14:2–17,  18:23–19:10.)  Finally, he remarked that, as a general rule, simply because Chief Gannon may have reviewed or served a disciplinary writeup did not necessarily mean he made the decision.  (Id. at 4:14–24.)

- Investigator Heyward: Investigator Heyward testified that he made the initial recommendation for Plaintiff to be terminated, based on his independent investigation, and that the ultimate decision would have been the Warden's. (Heyward Dep. 53:24–54:4.)

- Investigator Beese:  Investigator Beese could not speak specifically as to Plaintiff's case, but indicated that generally, upon completion of an investigative report, he would submit it to Heyward, who in turn would provide it to the Captain, Chief of Security, Deputy Warden, or Warden, one of whom would make a determination about disciplinary action.  (Beese Dep. 17:12–18:20.)

- <u>Deputy Warden Colucci</u>:  Deputy Warden Colucci admitted that he explicitly recalled reviewing Heyward's investigative report, personally reviewing the video footage, and making a recommendation directly to Warden Green that Plaintiff be terminated; the ultimate authority to terminate, however, came from the Warden. (Colucci Dep. 33:24–8, 42:23–43:1.)  He did not recall having any discussion with Chief Gannon about Plaintiff's termination.  (<u>Id.</u> at 48:14–24.)

- <u>Chief Gannon</u>:  Chief Gannon indicated that although he may have reviewed the investigative report for Plaintiff—consistent with the other witnesses testimony that Gannon would have been in the chain of review—he did not have any part or deciding authority in ultimately terminating Plaintiff.[8]  (Gannon Dep. 44:19–46:12.)

Considered collectively, the only reasonable inference is that Gannon might have been a singular, albeit non-determinative, step in an otherwise independent review of Plaintiff's actions.  Nothing in this evidence suggests that Gannon—who, according to Plaintiff, bore him some discriminatory animus—initiated, recommended, and ultimately caused Plaintiff's termination. Rather, that decision was clearly initiated by Investigator Heyward, with a recommendation for termination by Colucci, neither of whom had any demonstrable knowledge of Plaintiff's impairment or requests for leave.[9]  (<u>See</u> Heyward Dep. 61:22–62:1; Colucci Dep. 24:1–24,

---

[8]  Plaintiff also suggests that Sergeant Cooper initiated the entire disciplinary action by submitting the Disciplinary Inquiry Form.  Other than submission of a brief statement indicating that Plaintiff "[f]ailed to secure the control room door and allowed an inmate to the enter the Control room"—a fact which Plaintiff does not dispute—all evidence reveals that Sergeant Cooper had no involvement in any investigation or the issuance of the disciplinary action. (Def.'s Mot. Summ. J., Ex. X, Cooper Dep. 34:24–36:8.)  Moreover, Plaintiff admitted that he filed his own incident report indicating the same events and that there was a videotape of the incident.  As such, even without Sergeant Cooper's statement, Defendant would have been alerted to the incident.

     The only other officer about whom Plaintiff has suggested had any bias is Officer Juisti. There is no evidence, however, that Officer Juisti had any involvement in Plaintiff's discipline.

[9]  Plaintiff cites to the Supreme Court case of <u>Staub v. Procter Hospital</u>, 131 S. Ct. 1186, (2011) for the proposition that "'where an independent decision maker relies on information or action that were causal factors underlying a defendant's decision to terminate a plaintiff, the defendant is not insulated from liability.'" (Pl.'s Resp. Opp'n Summ. J. 26 (quoting <u>Staub</u>, 131 S.

49:21–50:1.)

Second, even making the broad and untenable leap to find that Chief Gannon was the
person who ultimately caused Plaintiff's termination, any suggestion that Gannon was motivated
by bias towards Plaintiff's disability—as opposed to being based solely on a finding of a security
violation—is not supported by the evidence of record.  Plaintiff claims that he was subject to
harassment from Chief Michael Gannon while on light duty.  (Id. at 140:19–25.)  The evidence,
however, does not establish any discriminatorily-motivated conduct.  On the day after Plaintiff
broke down in tears due to stress and went home, Chief Gannon commented that he heard
Plaintiff was acting "a little eccentric, a little crazy down in training . . . . [Y]ou are going to be

---

Ct. at 1194).)  Plaintiff then argues that even if Warden Green made the decision, Sergeant
Cooper's and Chief Gannon's tangential participation in the disciplinary process tainted the
process and prevents Defendant from being isolated from liability.
    Plaintiff's reliance on this case is incorrect on several grounds.  First, Plaintiff's quotation
does not appear anywhere in the case.  Moreover, that case was decided under the statutory text
of the Uniformed Services Employment and Reemployment Rights Act, a statute not at issue
here.  Finally, the Supreme Court in Staub did not automatically eliminate employer insulation
from liability where a biased supervisor made a recommendation regarding an adverse
employment action.  Rather, it stated that:

> [I]f the employer's investigation results in an adverse action for reasons unrelated to
> the supervisor's original biased action . . ., then the employer will not be liable.  But
> the supervisor's biased report may remain a causal factor if the independent
> investigation takes it into account without determining that the adverse action was,
> apart from the supervisor's recommendation, entirely justified.

Id. at 1193.
    In the present case, the evidence is clear that an independent investigation of the June
2011 incident occurred and neither Sergeant Cooper nor Chief Gannon presented any biased
report or made any recommendation regarding Plaintiff's termination.  Rather, the
recommendation was made by Inspector Heyward and by Deputy Warden Colucci, with review
and approval by Warden Green.  Moreover, there is no evidence that the termination was
motivated by any bias towards Plaintiff or was based on anything other than the security breach
caused by Plaintiff's admitted actions.

30

working in the mailroom from now on." (Id. at 142:4–11.)  Such a comment does not allow any

inference of bias by Gannon; rather it was simply repetition of a report made to him by someone

else.  When Gannon attempted to inquire into what Plaintiff was going through, Plaintiff

responded that it was none of his business.  (Id. at 142:22–25.)  Plaintiff conceded that this was

the sole comment Gannon ever made to him that could remotely be connected to his medical

condition.  (Id. at 146:12–21.)  To the extent that Plaintiff claimed that Gannon "rode him" about

having his hair cut, about having facial hair, and about his cell phone in their while working,

Plaintiff admitted that he was in violation of policies regarding being clean-cut and clean-shaven

and not using cell phones while on duty.  (Id. at 146:22–149:24.)  Finally, there is simply no

evidence that Gannon denied Plaintiff any days off or interfered with any of his requests for

vacation.

Ultimately, Plaintiff rests his belief that Gannon's behavior was motivated by either

Plaintiff's condition or his request for leave on the fact that, prior to his leave, Gannon was more

courteous to him.  (Id. at 145:17–11.)   Given the speculative nature of this testimony, no

reasonable factfinder could find that Gannon's alleged involvement in the decision to terminate

Plaintiff—three months after Plaintiff returned to full-duty and after Plaintiff committed an

obvious security violation—was more likely than not motivated by discriminatory animus rather

than by a legitimate, non-discriminatory employment determination.  Accordingly, the Court

declines to find that this evidence establishes pretext.

### 2.    Whether Similar Violations of the Security Policy by Other Correctional Officers Were Disparately Disciplined

Alternatively, Plaintiff contends Defendant's proposed legitimate, non-discriminatory

reason is pretext because leaving a control room door unlocked is not a terminable offense.  He

argues that both Sergeant Cooper and Lieutenant Juisti were routinely aware of control room

doors being unlocked and did not discipline correctional officers for doing so.  Yet, Plaintiff

committed one offense of leaving the control room door open and was terminated for this

offense.  Based on this evidence, Plaintiff claims that a jury would likely disbelieve that

Plaintiff's termination was motivated by his policy violation and was more likely motivated by a

discriminatory animus.

Plaintiff rests his argument on several pieces of testimony.  First, Plaintiff himself

remarked that other officers would leave control room doors either unlocked or open and that

Sergeant Cooper had, in the past, observed a control room door being opened.  (Dove Dep.

375:23–376:9.)  He specifically commented on one incident where Sergeant Cooper had an

inmate in the control room cleaning and left the inmate in there, while another correctional

officer was inside as well.  (Id. at 376:13–377:5.)  The officer who was assigned to the control

room at the time did not receive a suspension or termination.  (Id. at 377:6–9.)  Plaintiff also

testified that sergeants were all aware that control room doors were left open "because half the

time the control room officer would stick a water jug between the control room door.  The

sergeant would go up, you know you're not supposed to do this, and wouldn't write them up;

would just say can't do this, don't do that, whatever."  (Id. at 378:6–12.)  Yet, the control room

officers were never terminated.  (Id. at 378:13–17.)

In addition, Plaintiff notes that other correctional officers also believed that control room

doors were regularly left open and supervisors knew about it.  CO Griffin testified that although

the control room door was supposed to be locked, he was aware of many instances where it was

left unlocked and the supervisors knew about it.  (Griffin Dep. 21:4–24:9.)  Indeed, Griffin had

an incident where he was present when a control room door was left unlocked and, as a result, he

received a write-up and suspension.  (Id. at 24:10–25:24.)  Lieutenant Juisti also indicated that

during the time he worked at CEC, he was aware of control room operators leaving the door

unlocked, but it was not often.  (Juisti Dep. 38:24–39:16.)

   In the context of employee discipline, "[a] violation of company policy can constitute a

pretext for unlawful discrimination if others similarly situated also violated the policy with no

adverse consequence."  Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 322 (3d Cir.

2000).  At the pretext stage, the plaintiff must show with some specificity that the comparators

were more favorably treated.  Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 646

(3d Cir. 1998).  To be considered similarly situated, employees must have committed infractions

of "comparable seriousness."  McDonald v. Sante Fe Trail Transp. Co., 427 U.S. 273, 282

(1976); Nguyen v. AK Steel Corp., 735 F. Supp. 2d 346, 361 (W.D. Pa. 2010).  The employees

"'must have dealt with the same supervisor, have been subject to the same standards and have

engaged in the same conduct without such differentiating or mitigating circumstances that would

distinguish their conduct or the employer's treatment of them for it.'"  Hodczak v. Latrobe

Specialty Steel Co., 761 F. Supp. 2d 261, 269 (W.D. Pa. 2010) (quoting Ogden v. Keystone

Residence, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002), aff'd 451 F. App'x 238 (3d Cir. 2011));

see also Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 223 (3d Cir. 2009); McClain v. Pa.

Dep't of Corrections, No. Civ.A.09-1641, 2011 WL 2670204, at *8 (W.D. Pa. July 7, 2011).

"[P]recise equivalence in culpability between employees" is not required, only that they be

engaged in acts of "comparable seriousness."  McDonald, 427 U.S. at 283 n.11.

Plaintiff's argument fails to acknowledge the differentiating or mitigating circumstances between his own violation and the prior violations of CEC policy that he identified.  First, although Plaintiff identified instances wherein officers were not terminated for leaving a control room door unlocked even after a supervisor learned of the violation, Plaintiff has not identified any such cases that occurred on the particular control room of which Plaintiff was in charge—the SMU.  As noted by Sergeant Cooper,  the SMU houses the "worst of the worst" inmates and leaving the control room door open in that unit was an exacerbating situation since an inmate gaining control could have taken control of the entire unit.  (Cooper Dep. 37:21–38:6.)  Plaintiff himself admitted that the SMU housed "[u]pstate, very high profile guys, dangerous, i.e., extremely dangerous" and that an inmate trying to get into the control room was a "big deal." (Dove Dep. 60:23–25, 346:19–347:2.)  The officers assigned to the SMU were deemed to be "strong enough, good thorough officers" and they received additional training on the policies and procedures unique to that unit.[10]  (Id. at 59:3–60:11.)   Second, Plaintiff's examples of other violations of the control room door policy do not involve situations where an inmate forcibly and impermissibly entered the control room.  In the majority of the situations, the supervising officer simply found the door to be unlocked, but no entries occurred.  In the one instance involving an inmate being allowed to access a control room to clean it while a correctional officer was present

---

[10]  Plaintiff argues that the policy prohibiting control room doors from remaining unlocked makes no distinction between particular units.   Given the particular dangers associated with the SMU, however, it is more than reasonable to infer that leaving control room doors unlocked in that unit posed a more serious safety threat than leaving control room doors open on a different unit.  In turn, it would not be unreasonable for a disciplining authority to hold a specially-trained officer assigned to this unit to higher degree of compliance with policy.

with him, such limited and supervised access is expressly permitted by CEC policy.[11]  (Def.'s

Mot. Summ. J., Ex. FF.)  Third, although Plaintiff's "unnecessary" use of force to remove the

inmate was not cited as violation, that fact was an exacerbating factor in consideration of

Plaintiff's discipline.  (Heyward Dep. 42:16–44:18.)  Finally, the entirety of Plaintiff's incident

was captured on video.  (Def.'s Mot. Summ. J., Ex. V.)  Accordingly, an investigation of the

events did not have to rely on the recollection or credibility of multiple individuals, but could

easily be viewed and assessed objectively.

Faced with such evidence, no reasonable juror could find that similarly-situated

correctional officers committed infractions of "comparable seriousness," dealt with the same

supervisor, were subject to the same standards, and engaged in the same conduct without such

differentiating or mitigating circumstances that would distinguish their conduct or Defendant's

treatment of them for it.  While Plaintiff identified other situations where control room doors

---

[11]  Plaintiff also argues that, "[t]he record also contains evidence from Officer Griffin who testified that he was involved in a scenario where an inmate entered a control room right behind him because the door was left unlocked and that a supervisor came in shortly thereafter.  As a result, neither the control room officer nor Officer Griffin were terminated—even though Officer Griffin had previous discipline that warranted that he be suspended pursuant to Defendant's progressive discipline policy."  (Pl.'s Resp. Opp'n Summ. J. 19.)

Plaintiff mischaracterizes the testimony.  Officer Griffin actually appears to have testified to two separate instances.  In the first instance, an inmate pushed open the door to the control room and Officer Griffin told him to verbally get out, which he did.  (Griffin Dep. 29:5–21.)  He did not receive any discipline as a result of that incident because no supervisors saw or learned of the incident and he did not report it to anyone.  (Id. at 30:13–23.)  In the second incident, about which Officer Griffin could not recall date or time, an inmate walked into the control room while Griffin was in there and a supervisor came in behind him and discovered the control room door unlocked.  (Id. at 35:22–36:20.)  Griffin, however, was not the control room officer at the time, but simply got written up by a Lieutenant Reimel because he was there.  (Id. at 69:2–19.)  He was suspended at that time.  (Id. at 69:13–17.)  Absent any further details about this incident in the form of employment records or additional testimony, the Court cannot determine whether it is sufficiently similar in severity to Plaintiff's violation.

were left open, he did not identify any situations where control room doors were left unlocked on the SMU, an inmate gained entry to the control room, the offending officer used force to remove that inmate, and the entire incident was captured on video.  Moreover, given the overwhelming evidence that leaving a control room door open was itself a terminable offense, Plaintiff has failed to show any mitigating circumstances to warrant a deviation from that policy.  Thus, the Court does not find that this argument establishes pretext.

### 3.      Conclusion as to ADA and PHRA Discrimination Claims

In light of the foregoing, Plaintiff has failed to meet his "difficult" burden of proving that Defendant's legitimate, non-discriminatory reason for terminating Plaintiff—i.e., his violation of CEC policy resulting in a safety threat—is simply pretext for discriminating against Plaintiff due to his disability or need for medical leave.  Plaintiff has not established that any of the supervisors who were aware of or commented on his disability were actual decisionmakers for his termination, or even that those supervisors bore any demonstrable discriminatory animus towards Plaintiff.  Moreover, Plaintiff has not shown that his admitted violation of CEC policy was disciplined more harshly than violations occurring under like circumstances.  In sum, Plaintiff has not met his burden of establishing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  Nor has Plaintiff pointed to evidence in the record which would allow a reasonable factfinder to infer that discrimination was more likely than not a motivating or determinative cause of his termination.  Thus, the Court must grant summary judgment on the ADA and PHRA discrimination claims in favor of Defendant.

### B. ADA and PHRA Retaliation Claims

In addition to his discrimination claim, Plaintiff asserts that Defendant retaliated against him for seeking an accommodation in the form of leave to care for his disability. Defendant likewise seeks summary judgment on this Motion.

The court must analyze a retaliation claim under the ADA using the same framework employed for retaliation claims arising under Title VII. Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997). In order to establish a prima facie case of retaliation under the ADA, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Id. (citing Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)); LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 231–32 (3d Cir. 2007) (citing Moore v. City of Phila., 461 F.3d 331, 341–42 (3d Cir. 2006)).

Defendant now contends that this claim must fail for three reasons. First, it asserts that Plaintiff has failed to show any protected employee activity. Second, it argues that even if Plaintiff could show protected activity, there is no causal connection between that activity and the employer's action. Finally, assuming the prima facie case to be satisfied, Defendant contends that Plaintiff has not shown that Defendant's legitimate non-discriminatory reason for termination was pretextual. The Court addresses each in turn.

### 1. Protected Activity

The parties first disagree over whether Plaintiff engaged in any protected activity. Defendant asserts that Plaintiff has not shown that he opposed any acts or practices made

unlawful under the ADA.  It goes on to argue that the only time Plaintiff made a complaint was regarding his suspension for insubordinate conduct towards Sergeant Cooper and that complaint did not, at any point, suggest that Plaintiff felt he was being treated unfairly because of his disability or his request for an accommodation.  Plaintiff counters that he requested a leave of absence due to depression in February 2011, as well as vacation time in June 2011, both of which constituted protected activity.  Moreover, he argues that his complaint to Chief Gannon about Sergeant Cooper in May 2011 about his assignments constituted protected activity.

It is well established that seeking an accommodation under the ADA or other statutes constitutes "protected activity."  Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 759 n.2 (3d Cir. 2004); Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 190–91 (3d Cir. 2003); O'Donnell v. Pa. Dep't of Corr., 790 F. Supp. 2d 289, 311 (M.D. Pa. 2011), aff'd, 507 F. App'x 123 (3d Cir. 2012).  Moreover, numerous courts have recognized that a request for a leave of absence for medical treatment may constitute a request for a reasonable accommodation under the ADA.  Mascioli v. Arby's Rest. Grp., Inc., 610 F. Supp. 2d 419, 448 (W.D. Pa. 2009); Shannon v. City of Phila., No. Civ.A.98-5277, 1999 WL 1065210, at *5 (E.D. Pa. Nov. 23, 1999) (citing cases).

Given these principles, it is abundantly obvious that Plaintiff's request for a leave of absence due to his depression in February 2011 constituted a request for a reasonable accommodation.  Plaintiff expressly told Jeff Bergin, in Human Resources at CEC, that he needed a leave of absence due to his depression and anxiety because he was "mentally suffering and felt that he could not perform his job.  (Dove Dep. 64:20–65:12, 94:25–96:2.)  Although Plaintiff did not qualify for FMLA leave, (Bergin Dep. 15:18–20), Plaintiff nonetheless sought

38

and received approval for a leave of absence.  (Id. at 19:5–12.)  As Defendant unequivocally

knew that this leave was for treatment of a medical condition, Plaintiff's actions constituted a

request for accommodation, which, in turn, qualified as protected activity under the ADA.

Plaintiff's other allegations of protected activity, however, do not meet the requisite

standards under the ADA.  First, Plaintiff's requests for vacation time in June 2011 do not rise to

the level of a request for an accommodation.  Pursuant to the ADA, the employee must provide

the employer with notice of the disability and the desired accommodation, and make clear the

accommodation is for the disability.  Mascioli, 610 F. Supp. 2d at 449.  The employee's request

need not be written, nor need it include the "magic words 'reasonable accommodation,' [but] the

notice nonetheless must make clear that the employee wants assistance for his or her disability."

Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999); Peter v. Lincoln Tech. Inst.,

Inc., 255 F. Supp. 2d 417, 437 (E.D. Pa. 2002).  By his own admission, Plaintiff never informed

Defendant that his requests for "vacation" on June 22 and 25, 2011 were for a medical reason.

(Dove Dep. 193:2–13.)  Rather, he stated that all he told his shift commander, Lieutenant Reimel,

was "I'm low on vacation days, I think I'm almost out.  And I need this day, I have something

coming up."  (Id. at 264:19–265:3.)  When asked if he indicated a need for medical treatment at

that time, Plaintiff explained, "it was none of their business.  They were aware of my condition.  I

had medical documentation.  There was no need to tell my shift supervisor.  It is a HIPAA

violation.  If I want to disclose it, I can."  (Id. at 193:14–18.)  Although Plaintiff now argues that

Defendant must have implicitly known why he was taking days off, Defendant's prior awareness

of Plaintiff's existing medical condition does not equate to Defendant's awareness that Plaintiff's

request for "vacation time" was for medical reasons.  It is not inconsistent for an employee with a

disability to request vacation time to use for nothing more than personal business.  To suggest that Defendant should have somehow divined that Plaintiff planned to use his "vacation" time to care for his disability requires broad and improper speculation.

Finally, as to Plaintiff's complaint to Chief Gannon in May 2011, the Court likewise finds that this does not constitute protected activity.  The ADA's anti-retaliation provision provides a cause of action to an individual who "opposed any act or practice made unlawful" by the ADA.  42 U.S.C. § 12203(a).  Certainly, "[o]pposition" to discrimination "can take the form of 'informal protests of discriminatory employment practices, including making complaints to management.'"  Moore, 461 F.3d at 343 (quotation omitted).  Complaints about matters unrelated to discrimination or the disability do not constitute protected activity.  Stouch v. Twp. of Irvington, 354 F. App'x 660, 667 (3d Cir. 2009) (finding that complaints to supervisors about the communications room that were not related to any disability, but rather focused on the plaintiff's dissatisfaction with the conditions of the room did not constitute protected activity).

In this case, after being written for insubordination to Sergeant Cooper, Plaintiff was called to Chief Gannon's office.  Plaintiff recounted the ensuing conversation, in its entirety, as follows:

> Q.    You went to Gannon's office?
>
> A.    Yes.
>
> Q.    What went on?
>
> A.    Talked about my behavior, he wouldn't let me say anything I had to say about it.
>
> Q.    What did he say?

A.   He talked about permanent posts.

Q.   What did he say about permanent posts?

A.   There are no permanent posts.

Q.   Meaning that even if you want to work at SMU every day, that you don't work at SMU every day, you can be assigned to a different—

A.   Yes.

Q.   —unit?

A.   Yes.

Q.   Okay.  What else did he say?

A.   I argued the fact that I said, well if you check the logbooks for DUI, medical, rover, intake, unit 10, those guys are there every day.  So permanent posts do exist here.  And he just looked at me.

Q.   Did he say anything in response.

A.   No.

Q.   Did you say anything further?

A.   No.

(Dove Dep. 179:23–180:24.)  At no point did Plaintiff indicate that he was being harassed or discriminated against because of his disability.  Nor did he contend make any complaint or opposition to any other practice or act that violates the ADA.  Accordingly, his discussion with Chief Gannon in May 2011 does not rise to the level of protected activity.

In sum, the only protected activity on which Plaintiff can rest his retaliation claim is his requested leave of absence in February 2011.  The remaining activity is not "protected" for purposes of the ADA.

41

2.     **Causation**

The third element of a prima facie case of ADA retaliation requires a showing of a causal connection between the Plaintiff's protected activity and the adverse employment action.  To determine whether a plaintiff has met the causation element, the court must consider all evidence that is "potentially probative of causation."  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000).  Temporal proximity between the protected activity and the employer action may indicate causation, but "'the mere fact that adverse employer action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.'"  Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997)).

Generally, temporal proximity of a retaliatory act to a protected activity is probative, but not dispositive of the causation element.  Estate of Smith v. Marasco, 318 F.3d 497, 512–13 (3d Cir. 2003).   Stated differently, temporal proximity between the protected activity and the employer action may indicate causation, but "'the mere fact that adverse employer action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.'"  Krouse, 126 F.3d at 503 (quoting Robinson, 120 F.3d 1286).  To be "unusually suggestive" of a retaliatory motive, "the temporal proximity must be immediate."  Lorah v. Tetra Tech, Inc., 541 F. Supp. 2d 629, 636 (D. Del. 2009).  The Third Circuit has suggested that a temporal proximity of two days is sufficient to establish causation, see Farrell, 206 F.3d at 279 & n.5, whereas a temporal proximity of ten days is sufficient to establish causation only when accompanied by other evidence of wrongdoing,  Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003); see also Fischer v. Transue, No.

42

Civ.A.04–2756, 2008 WL 3981521, at *10 (M.D. Pa. Aug. 22, 2008) (holding that temporal

proximity of twenty-two days was insufficient to establish causation); Smith v. ABF Freight Sys.,

Inc., No. Civ.A.04-2231, 2007 WL 3231969, at *11 (M.D. Pa. Oct. 29, 2007) (holding that

temporal proximity of one and one-half months was insufficient to establish causation); Mar v.

City of McKeesport, No. Civ.A.05-19, 2007 WL 2769718, at *4 (W.D. Pa. Sept. 20, 2007)

(holding that temporal proximity of three months was insufficient to establish causation); Killen

v. N.W. Human Servs., Inc., No. Civ.A.06-4100, 2007 WL 2684541, at *8 (E.D. Pa. Sept. 7,

2007) ((holding that temporal proximity of seventeen days was insufficient to establish

causation).

   "[I]n cases where temporal proximity is not 'unusually suggestive' of retaliatory motive,

the Third Circuit has demanded further evidence to substantiate a causal connection."  McCloud

v. United Parcel Serv., Inc., 543 F. Supp. 2d 391, 401–02 (E.D. Pa. 2008).  "Such other evidence

may include, but is not limited to, a 'pattern of antagonism' by the employer that could link the

adverse action with Plaintiff's complaint."  Id.   The Third Circuit has specifically remarked that

absent the unduly suggestive temporal proximity, a causal link between protected activity and

adverse action may be inferred from "an intervening pattern of antagonism following the

protected conduct, or the proffered evidence examined as a whole."  Peace-Wickham v. Walls,

409 F. App'x 512, 522 (3d Cir. 2010).  For example, the Court of Appeals held that timing

combined with evidence of vague or inconsistent reasons given by an employer for an

employee's termination was sufficient to satisfy the causation prong of the prima facie case.

Abramson v. William Paterson Coll. of NJ, 260 F.3d 265, 289 (3d Cir. 2001); Waddell v. Small

Tube Prods., Inc., 799 F.2d 69, 73 (3d Cir. 1986).

In the present case, Plaintiff first argues that temporal proximity exists because he was terminated approximately four months after his February 2011 leave of absence.[12]  As is well-established by Third Circuit jurisprudence, however, any lapse of long time longer than several days is generally insufficient to establish unusually suggestive temporal proximity.[13]

Alternatively, Plaintiff asserts that the relatively short time period between the protected activity and his termination, combined with evidence of ongoing antagonism, establishes causation.  Specifically, he argues as follows:

> The record is replete with evidence that Mr. Dove's supervisors harassed him and made derogatory comments about his mental health when he returned from his leave of absence.  Mr. Dove's testimony about being called crazy by Sergeant Cooper, Lieutenant Juisti, and Chief Gannon is not the only evidence in the record about the harassment.  Sergeant Justin Wood clearly testified about the relentless nature of the harassment that Mr. Dove received. . . . Mr. Dove was subjected to derogatory comments about being "crazy" and a "nut job."  Sergeant Cooper and Lieutenant Juisti also made these comments outside the presence of Mr. Dove, but in the presence of Sergeant Wood.  Despite being cleared to full-duty, Mr. Dove was relegated to working in the mail room and then unjustifiable disciplined insubordination [sic], despite that Sergeant Cooper was the individual who was quick to angrily berate Mr. Dove.  Then in requesting occasional time off in the months that followed his leave of absence, Chief Gannon tried to interfere with Mr. Dove's ability to take time off.  The pattern of harassment and antagonism that occurred after Mr. Dove's return evidences Defendant's reliance on Mr. Dove's disability and leave of absence in the decision to terminate his employment.

(Pl.'s Resp. Opp'n Summ. J. 25.)

---

[12]  Plaintiff also contends that he was terminated approximately one month after his complaint to Chief Gannon and one week after he took two days off in June.  As set forth above, however, neither of those events constituted "protected activity."

[13]  Plaintiff cites a series of cases to support his claim of unusually suggestive temporal proximity.  These citations are inapposite for two reasons.  First, all but one of these cases is from outside the Third Circuit, meaning that to the extent they conflict with Third Circuit precedent, this Court must disregard them.  Second, none of the cases suggest that the causation element is satisfied by a lapse of time as long the lapse in the present case.

Aside from presenting a highly exaggerated summary of the evidence of record,

Plaintiff's scattered argument does not establish causation.  First, none of the above evidence

shows that Plaintiff was subject to ongoing harassment because of his disability or leave.  As

noted previously, Chief Gannon's comment about hearing that Plaintiff was acting "a little

eccentric, a little crazy down in training" was nothing more than a recitation of a report he

received after Plaintiff admittedly had a mental breakdown causing him to go home.  Plaintiff

could not remember any other comments by Gannon about his medical condition.  (Id. at

146:12–21.)  Second, Plaintiff did not recall any other supervisors or member of administration

treating him in a hostile manner while he was on light duty.  (Id. at 149:25–150:3.)  Plaintiff

claimed that he heard other correctional officers saying that he was out "because he's crazy," but

could not identify any particular officers, comments, dates, or times.  Even assuming such

comments occurred, these correctional officers were non-supervisory and had no part in

Plaintiff's termination.  Third, while Plaintiff alleges that he was relegated to the mail room upon

return to full-duty, he fails to mention that he was reassigned to the SMU only a couple of days

later.  Fourth, as to the discipline by Sergeant Cooper, Plaintiff admitted that he was disrespectful

to her despite her supervisory role, and he later apologized to her.  Finally, there is no evidence

that Chief Gannon interfered in any way, shape, or form with Plaintiff's request to take additional

days off in May and June 2011, as those days were approved after only one request by Plaintiff.

To the extent that Sergeant Wood overheard both Sergeant Cooper and Lieutenant Juisti

call Plaintiff "crazy" or a "nutjob," such testimony is insufficient to establish causation.

Lieutenant Juisti had absolutely no involvement in any investigation of, recommendation, or

decision to terminate Plaintiff.  Moreover, Sergeant Cooper, while obligatorily reporting the

incident of June 27, 2011—an incident that Plaintiff does not deny occurred—did not have any other role in the investigation of, recommendation, or decision to terminate Plaintiff.  Finally, there is no allegation that they made any discriminatory or influential comments to any investigator or decisionmaker that was involved in Plaintiff's termination.

In short, the record is devoid of evidence showing a persistent and ongoing pattern of antagonism from the time Plaintiff took his medical leave in February 2011 to the time Plaintiff was terminated on July 1, 2011.  Any comments he faced were sporadic in nature and were made by individuals not involved in his termination.  Nothing in the record would allow a reasonable factfinder to conclude that Plaintiff's firing was the result of animus based on his request for a brief leave of absence in February.  Accordingly, the Court finds that Plaintiff has not established his prima facie case.

### 3.      Legitimate Non-Discriminatory Reason and Pretext

Finally, even assuming *arguendo* that Plaintiff could satisfy the causation element, his claim of retaliation must fail at the legitimate, non-discriminatory reason and pretext stage.  As set forth in detail above, Defendant has put forth an abundance of evidence indicating that Plaintiff's termination came about only after he violated CEC policy and left the control room doors unlocked in the SMU—the unit housing the most dangerous prisoners—thereby allowing an inmate to access the control room door and resulting in a physical confrontation between Plaintiff and that inmate, all of which was captured on video.  As further explained in the previous discussion, Plaintiff has failed to come forth with any evidence showing that this reason was nothing more than pretext for either disability-based discrimination or retaliation for requesting and taking leave in early February 2011.  Having failed to meet his burden of coming

forward with evidence of pretext, Plaintiff's retaliation claim must likewise fail at this juncture.

## IV.    CONCLUSION

Undoubtedly, Plaintiff suffers from some form of mental illness and has now had to face termination from his position.  The mere coexistence of these two facts, however, does not automatically require the conclusion that the former led to the latter.  Rather, the evidence is clear and undisputed that Plaintiff committed a security breach that is, by all accounts, a terminable offense at CEC.  In lieu of summarily terminating Plaintiff, Defendant had an independent investigator conduct an investigation of the events, prepare a report, make a recommendation, and submit his findings for review by multiple supervisory levels.  The recommendation for termination was ultimately approved by the Deputy Warden and Warden (if not directly, then at minimum on appeal), with no intervention from any of the individuals about whom Plaintiff made discrimination claims.  To the extent Plaintiff faced any discriminatory behavior from any supervisor at CEC, he has failed to introduce evidence that would allow any reasonable factfinder to connect that behavior or animus to his ultimate separation from employment or to otherwise find that the security breach violation was mere pretext for discrimination or retaliation. Therefore, the Court finds that no genuine issue of material fact remains and that summary judgment is warranted in favor of Defendant and against Plaintiff.

An appropriate Order follows.